**UNITED STATES of America**

v.

**James Robert DORSEY, Appellant.**

**UNITED STATES of America**

v.

**Faye Margaret CRAWFORD a/k/a Faye Margaret Powell, Appellant.**

**Nos. 77–1750, 77–1801.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 10, 1978.

Decided Dec. 21, 1978.

As Amended Jan. 12, 1979.

---

**39.** *See* note 9 *supra.*

Nancy A. Petranto * and Evelyn G. Kitay,* with whom Michael E. Geltner, Washington, D. C. (appointed by this Court), and Larry J. Ritchie, Washington, D. C., were on the brief, for appellants.

Michael W. Farrell, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty. and John A. Terry, Asst. U. S. Atty., Washington, D. C., were on the brief, for appellee.

Before BAZELON, McGOWAN and MacKINNON, Circuit Judges.

Opinion for the court filed by Circuit Judge McGOWAN.

McGOWAN, Circuit Judge:

After the police, in the course of executing a search warrant at a private dwelling, discovered appellants Robert Dorsey and Faye Crawford in a bedroom containing 83½ grams of two-percent-purity heroin, both were arrested and charged with local and federal narcotics offenses. Crawford was also charged with several firearms violations under local and federal statutes. A principal challenge by both appellants is to the sufficiency of the search warrant; and both object to their multiple narcotics convictions for possession and possession with intent to distribute. In addition, each appellant presses other claims relevant solely to his or her appeal. Although we agree with the trial court that no impropriety tainted the search, we remand Crawford's case for further consideration by the District Court of the admissibility of certain credibility-impeaching evidence; and we remand both cases for vacation of overlapping convictions.

I

On March 1, 1977, several officers of the Narcotics Branch of the Metropolitan Police Department executed a search warrant which specified the "ENTIRE PREMISES" of a certain private dwelling, allegedly occupied by one Patricia Wright, on "T" Street, Northwest, in Washington, D.C. During the five months prior to this search, officers of the Narcotics Branch had entered the dwelling—a three-story structure with one entrance—in executing another search warrant, making arrests, and delivering subpoenas. In addition, they had kept rather constant watch on the premises for some time and recently had received a report from an averredly reliable informant who had entered the first floor of the dwelling and purchased drugs there from Patricia Wright. On the basis of police observations of the dwelling and the informant's report, the police had secured a magistrate's authorization of the search.

* Entered an appearance as Student Counsel pursuant of Rule 20 of the General Rules of this Court.

Eight to ten officers in four squad cars arrived at the specified dwelling to execute the warrant. They were greeted with shouts of "Police. Here come the police. Rollers!" from the scores of people standing on nearby sidewalks. As one police officer ran to the rear of the building, he saw two people jump out of second or third story windows, one onto an adjoining roof, and the other into the window of the building next door.

Meanwhile, the other officers, after knocking, announcing their identity and purpose, and hearing shouts inside, had forced the front door open and, with guns drawn, moved quickly to the upper floors. Within seconds, the attention of the police became focused on the middle of the three rooms on the second floor. The first officer to reach that floor noticed that the door to the middle room—a bedroom—was open; and that three persons, including both appellants, were inside. Two other people, including the occupant named in the warrant, Patricia Wright, were seen moving away from the room quickly. One detective stepped into the room, "yelled 'Police,'" and told all of the occupants not to move. He then immediately seized in succession, first, from an open purse identified as belonging to appellant Crawford, a .25 caliber automatic pistol with obliterated serial numbers; second, from a dresser top, a plastic bag containing brownish-white powder later identified as heroin, a quantity of the same powder which had been spilled onto an open book, and some paraphernalia associated with the distribution of heroin; and third, from the floor, a torn paper bag containing eighteen plastic bags filled with the same brownish-white substance, next to which were found three plastic bags of the substance. About this time, one of the officers "hollered out that [he] had found the dope."

At the same time as these events occurred, other officers were calling to and pursuing the people who had been moving away from the doorway of the middle room and those who had been observed jumping out of the upper story windows. Some of these people were apprehended and brought back to the central, second-floor bedroom, until five suspects and at least five officers were in the room. At some point thereafter, and subsequent to the above-listed seizures, according to police testimony which is undisputed, an officer read the suspects their *Miranda* rights from Police Department Standard Form 47. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Although the police department uses the reverse side of that form as a record of waiver of those rights—which arrestees are asked to sign and date after answering several questions affirmatively—none of the five suspects, while gathered in the central bedroom, were asked the relevant questions or were given the opportunity to sign the form.[1]

Police testimony further indicated that, immediately after the officer read the "rights" side of Standard Form 47, the same officer inquired generally as to the ownership of an army field jacket discovered in the room, a search of which had turned up paraphernalia for heroin use. Appellant Dorsey reportedly answered, "That's my stuff, I'll take the beef for that." In answer to another inquiry as to who the permanent occupant of the room was, Dorsey again reportedly answered affirmatively, verifying an inference that the jury was asked to draw from a mural painted on a wall of the room and signed by Dorsey.[2] The police removed the five sus-

---

1. Appellant Crawford did later sign the waiver form at the police station. She does not challenge the introduction of any of the post-arrest statements made by her.

2. This portrayal of the events following the police entry into the room and the seizure of the three sets of items listed above, appears in the testimony of several police officers at trial. Dorsey's testimony differs in some respects.

According to him, the police, shortly after entering the room, asked to whom it belonged. Following Dorsey's acknowledgement that it was his, the police accused him of being the owner of the "dope," to which he allegedly responded, "this is my room, but that's not my dope." Then, the officers seized a jacket hanging on the wall and found in it a "work," *i. e.,* a syringe and other paraphernalia of heroin use. In answer to an officer's question about these

pects to the station house, where they were booked. During this procedure, Crawford made incriminating statements, including some overheard by police while Crawford spoke with someone on the telephone.

The government charged both appellants with a local law narcotics possession offense, 33 D.C.Code § 402 (1973), and with possession of a controlled substance with intent to distribute, a federal offense under 21 U.S.C. § 841(a) (1976). In addition, Crawford faced two federal firearms charges, 18 U.S.C. §§ 922(k), 924(c)(2) (1976) (receipt of a firearm in interstate commerce with the serial number removed; and unlawfully carrying a firearm during commission of a felony), and two local firearms charges, 22 D.C.Code §§ 3204, 3212 (1973) (carrying an unlicensed firearm; and obliteration of identifying marks on a firearm).

At a suppression hearing before trial, both appellants asserted that the dwelling on "T" Street, although not registered as such with the local government, served as a multi-residence rooming house, as to which individual warrants for each unit were required. *See, e. g., Moore v. United States,* 149 U.S.App.D.C. 150, 152, 461 F.2d 1236, 1238 (1972). Because the warrant specified the entire dwelling, and named only one person, Patricia Wright, who assertedly did not occupy the room from which the contraband was seized, appellants argued that the warrant lacked the necessary specificity.

The trial court denied the suppression motion. Its rulings appear to have been that (1) appellants' evidence did not show that the police should have known that the dwelling was a rooming house, and (2) its status as a rooming house was in any case "immaterial" because the police had sufficient information, albeit much of which was not included in the affidavit used to secure the warrant, to give the police probable cause to search any subunit within the overall structure.

At the joint trial of both appellants and two other defendants, the government relied on the evidence derived from the search, as described above. In addition, police officers related to the jury the post-arrest statements of both Dorsey and Crawford. Both appellants took the stand and denied having any connection with the contraband found in Dorsey's room.[3] The government impeached Crawford's testimony by eliciting an admission from her that she recently had been convicted for shoplifting in Maryland.

The jury convicted Dorsey of both narcotics offenses with which he was charged, and convicted Crawford of all of the offenses for which she was indicted except obliterating the identifying marks of a firearm under 22 D.C.Code § 3212 (1973).[4] The trial judge then sentenced Dorsey to 1–3 years of imprisonment, with a special three-year parole term, on the federal narcotics distribution conviction, and to 1 year of imprisonment, to run concurrently, on the local possession count. Crawford was sentenced to 2–6 years of imprisonment, with a special three-year parole term, on the federal narcotics distribution conviction, and to 1 year

items, Dorsey stated, "That's my jacket, this is my room, that's my work. . . . But it's not my dope. . . ." Dorsey also claims that he was not arrested in the middle bedroom, as the police witnesses indicated, but instead that the arrest occurred in an adjoining bedroom. Dorsey did not deny that his *Miranda* rights had been read to him. Consistent with his testimony, Dorsey attempted throughout the trial to prove that the heroin belonged to Faye Crawford and that, unbeknownst to him until just before the police raid occurred, she, and perhaps Patricia Wright, had entered his room on the evening of the raid and began using it for the purpose of cutting and packaging the drug.

3. Crawford admitted having possession of the pistol at the time of the raid. She claimed that she had been given the gun soon after entering the premises. She explained her presence at the dwelling, where she once lived, as a short visit to use the telephone and to chat with acquaintances.

4. A third codefendant, Jean Tucker, whom the police had discovered sitting in the bedroom with Dorsey and Crawford during the raid, was convicted of the same two offenses as Dorsey. The jury acquitted a fourth codefendant, one of the people seen moving away from the room in question as the raid began. The fifth person arrested with Dorsey and Crawford, Patricia Wright, was tried separately.

of imprisonment, to run concurrently, on the local possession count. In sentencing her on the firearms offenses, however, the trial judge apparently made a technical mistake. While specifying a sentence of 3 years on "count three," he identified that count as "carrying a pistol without a license and obliteration of i. d. marks [in] violation of 18 U.S.C. [§] 922(k)." Thus, although he cited the federal statute prohibiting receipt in interstate commerce of a firearm with the serial number removed, on which Crawford indeed had been convicted, he actually described in terms two local charges, 22 D.C.Code § 3204 (carrying an unlicensed firearm) and 22 D.C.Code § 3212 (obliteration of identifying marks on a firearm), as to only the former of which the jury had found her guilty.[5] The trial judge further sentenced Crawford under 18 U.S.C. § 924(c)(2) (1976), to 2–6 years of imprisonment for unlawfully carrying a pistol during the commission of a felony, and ordered that all of her sentences run concurrently.

On appeal, both appellants have renewed their unsuccessful pretrial objection to the search of the "T" Street dwelling, and both have challenged their multiple convictions for possession of, and possession with intent to distribute, narcotics. Further, both appellants have individually raised objections to the admission against them at trial of certain evidence. Dorsey, despite his failure to object at trial, now challenges the admission of the statements he made following his arrest. He argues that the trial court erred in admitting the statements without insisting upon proof that they were preceded by a knowing and intelligent waiver of his right to remain silent or to have a lawyer present during interrogation.

Appellant Crawford's evidentiary claim relates to the government's impeachment of her by reference to a prior shoplifting conviction. She argues that the trial court lacked authority to allow the presentation of such evidence because the conviction did not involve "dishonesty or false statement,"

as required by Rule 609(a)(2) of the Federal Rules of Evidence, and because the trial court did not make the determination necessary for admissibility under Rule 609(a)(1). Finally, Crawford also challenges her multiple convictions for the three offenses growing out of her possession of a firearm at the time of her arrest.

II

Federal courts long have held that police officers, before they constitutionally may search a separate residential unit within an apartment building, must have probable cause to do so that is specifically related to that unit. E. g., United States v. Hinton, 219 F.2d 324, 325–26 (7th Cir. 1955). "A single warrant cannot describe an entire building when cause is shown for searching only one apartment." Moore v. United States, supra, 149 U.S.App.D.C. at 152, 461 F.2d at 1238. The Fourth Amendment basis for this rule is that apartment dwellers not only have "a reasonable 'expectation of privacy,'" Terry v. Ohio, 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), quoting Katz v. United States, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring), within the entire apartment building that runs against persons who do not live in (or have permission to enter) the building; they also have such an expectation within their individual apartments that runs against persons who do not live in (or have permission to enter) their individual apartments, including persons who nonetheless have authority to be in the building as a whole. Consequently, before police officers may frustrate this latter expectation by entering an apartment, they must demonstrate—in most cases before the fact and to a magistrate—that their proposed action is reasonable in light of the existence of probable cause to believe that a crime has been committed and that evidence relevant thereto is located in that apartment. See Aguilar v. Texas, 378 U.S. 108, 84 S.Ct.

---

**5.** Because this error is so clear and is conceded by all parties, we see no reason for further discussion of it beyond remanding so that the trial court may resentence the defendant on the charges for which she was convicted—18 U.S.C. § 922(k) and 22 D.C.Code § 3204—and amend the Judgment and Commitment Order accordingly.

1509, 12 L.Ed.2d 723 (1964); *Chapman v. United States,* 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961).

The apartment-search cases, however, have eschewed "over-technical[ity]," *United States v. Hinton, supra,* 219 F.2d at 326, and have not ignored the "realities of administration of criminal justice," *Moore v. United States, supra,* 149 U.S.App.D.C. at 152, 461 F.2d at 1238. Instead, they require only as much specificity as police officers, with "practical accuracy," *United States v. Santore,* 290 F.2d 51, *aff'd in relevant part en banc,* 290 F.2d 74 (2d Cir. 1960), *cert. denied,* 365 U.S. 834, 81 S.Ct. 745, 5 L.Ed.2d 743 (1961), may provide. In particular, the cases seem to embody a rule that the "reasonable expectations of privacy" protected by the warrant requirement, in the context of subdivisions of single buildings, extend as far as, but no further than, the police actually knew or reasonably should have assumed they extended.[6]

Thus, in the cases that have voided warrants for lack of single-residence specificity, the police knew, or with reasonable investigation could have found out, that the building specified was subdivided into several, distinct living quarters. As such, those government agents were under a responsibility to pinpoint the offending unit or units and the incriminating evidence likely to be found therein so that the issuing magistrate could determine which of the residents' separate privacy expectations could reasonably be disappointed through the execution of a search warrant. *E. g., United States v. Higgins,* 428 F.2d 232, 234–35 (7th Cir. 1970) (apartment building had several separate addresses and otherwise was subdivided into apartments in ways that were externally "evident" to the police); *United States v. Hinton, supra,* 219 F.2d at 325, 327 (government informer was familiar with the inside of the building, which was subdivided into apartments, and the police apparently discovered that fact before entering the building); *United States v. Harris,* 365 F.Supp. 261, 262 (N.D.Ohio 1972) (based on a prior search, "the agents [were] aware of the . . . physical configuration of the [multi-unit] residential dwelling . . . in question"), *aff'd,* 486 F.2d 1404 (6th Cir. 1973); *United States v. Brown,* 151 F.Supp. 441, 442 (E.D.Va.1957) (police knew the building was a rooming house and "could have . . . obtained" information that suspect did not rent all of the rooms); *see United States v. Kaye,* 139 U.S.App.D.C. 214, 215–216, 432 F.2d 647, 648–49 (1970) (invalidating search of upstairs living quarter, which had a separate address and "no apparent connection" with the downstairs store specified in the warrant); *cf. Moore v.*

---

**6.** The rule in the apartment-search cases suggests that the expectations of privacy protected by the Fourth Amendment are not exactly coextensive with the actual, subjective expectations of the particular search victim, even if reasonable, and instead that they also may depend on the respect that we expect well-regulated police officers to have for the privacy rights of citizens in general. This objective and police-focused view follows not only from the dictates of practicality discussed above but also from a regard for the deterrent impact on abusive law enforcement activity that is an important goal of the exclusionary rule and, indeed, the Fourth Amendment. *See, e. g., Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 412–15, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (Burger, C. J., dissenting); *Linkletter v. Walker,* 381 U.S. 618, 636–37, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965); *Mapp v. Ohio,* 367 U.S. 643, 656, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); McGowan, *Rule-Making and the Police,* 70 Mich.L.Rev. 659, 662–63, 673–74 (1972). *See also Scott v. United States,* 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978) (focus in Fourth Amendment cases is typically on reasonableness of police activity in light of facts known to officers). In this regard, it is worth noting that, although the author of the phrase "expectation of privacy," Justice Harlan, originally intended it to refer simply to the search victim's *subjective . . . expectation . . .* that society is prepared to recognize as 'reasonable,' " *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring) (emphasis added), he later retracted the italicized adjective. *United States v. White,* 401 U.S. 745, 786, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971) (Harlan, J., dissenting). He suggested that the Fourth Amendment cannot logically turn on privacy expectations (or their lack)—even if they unquestionably and reasonably have (or have not) entered the minds of citizens—if they derive from outmoded "customs and values of the past." *Id. See* Amsterdam, *Perspectives on the Fourth Amendment,* 58 Minn.L.Rev. 349, 384 (1974).

*United States, supra,* 149 U.S.App.D.C. at 151–152, 461 F.2d at 1237–38 & n.1 (warrant that failed to specify one of two apartments on "2d Floor" of the specified building held valid because the annexed affidavit twice referred to "Apartment # 7").[7]

To the cases just cited should be compared *United States v. Santore, supra,* in which the subdivided house searched was "to all outward appearances a one-family house with a front door and a side door, and it had always been registered with the local authorities as a one-family dwelling." 290 F.2d at 67. Because no investigation had, nor reasonably should have, apprised the police of the dwelling's multi-residence character, the "entire premises" warrant met the specificity requirement under the Fourth Amendment. *Id. See United States v. Davis,* 557 F.2d 1239, 1247–48 (8th Cir. 1977); *United States v. Gusan,* 549 F.2d 15 (7th Cir.), *cert. denied,* 430 U.S. 985, 97 S.Ct. 1682, 52 L.Ed.2d 379 (1977); *United States v. Bermudez,* 526 F.2d 89, 96–97 & n.5 (2d Cir. 1975), *cert. denied,* 425 U.S. 970, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976).

In this case, appellants contend that police seized the evidence used to convict them in a raid on a rooming house pursuant to a warrant issued for the entire premises but reflecting probable cause only for that part of the premises occupied by Patricia Wright. They argue that the warrant is accordingly invalid and that its fruits must be suppressed. The acknowledged difficulty in appellants' theory is that the "T" Street dwelling in question showed no outward signs of multiple residency—such as separate entrances, doorbells, mailboxes,

name plates, apartment numbers, or "room for rent" signs. In addition, as police investigators determined prior to applying for the search warrant, the dwelling was not registered as a rooming house with the Department of Licensing, nor, probably, would it have been capable of continuing as such had its owner submitted to the safety inspections that all such dwellings must pass under local law.[8]

This dearth of external indicia of multiple occupancy undercuts appellants' claims that the police knew or reasonably should have known that the "T" Street dwelling served as a rooming house, and thus that the various residents had separate privacy expectations that were not properly respected in the warrant for the "ENTIRE PREMISES." *See United States v. Santore, supra; United States v. Davis, supra; cf. United States v. Higgins, supra; United States v. Esters, supra* note 7. Appellants fall back on the argument that the prior search of, and subpoena service at, the premises by officers of the police department, including some who took part in the search challenged here, as well as the informant's observations of the inside of the building, gave the police actual notice of the dwelling's use as a rooming house. *See United States v. Harris, supra.*

We affirm the district judge's contrary finding on this point, which he based in large measure on his doubts about the credibility of appellants' testimony as to the *internal* indicia of multiple occupancy that the police might have seen in their prior observations of the inside of the dwelling.

---

7. Some language in *Moore* suggests that the mere subjective belief on the part of police that only one apartment covered the "Entire Premises, 2d Floor"—the area named in the warrant—could not justify their intrusion in an area that turned out to contain two apartments. 149 U.S.App.D.C. at 151, 461 F.2d at 1237. Because the court held that the appended police affidavit in the case, by referring to a particular apartment, cured any defect in the warrant, the above suggestion is dicta. Nonetheless, the case is consistent with the analysis in text because the reasonableness of the police officer's belief was not shown. *See United States v. Esters,* 336 F.Supp. 214, 219 (E.D.

Mich.1972) (belief on the officer's part that the building had a single occupant, although honest, was unreasonable in light of outward signs of multiple occupancy, and hence not enough to justify an unspecific warrant).

8. Uncontradicted testimony showed that the dwelling had only one entrance, its back entrance having been made useless by disrepair. This condition on its face appears to violate the fire escape and inspection requirements in 5 D.C.Code § 301 (1973), for, *inter alia,* "rooming houses" of three stories or more (with some exceptions not obviously relevant here).

We need not rely entirely on the trial court's superior vantage point in assessing testimonial veracity, however, for we also find his disposition fully supported in the record.

First, the observations of police during the service of subpoenas, and of the informant's during previous "buys" at the dwelling, had been confined to the first floor, and apparently extended no further than a hallway, living or common room, and kitchen—all normal indicia of a single-family unit. Moreover, although the prior search did take police into the rest of the house, they then found (as was also the case during the later search, challenged here) that the doors to the upstairs bedrooms had no numbers, no locks,[9] and apparently were usually left wide open, bearing out the view that any occupant of the house had "the run" of the whole structure. In addition, the police did take the precaution of checking with the local Department of Licensing, and they found no rooming house registered to the address in question. Had they gone further, as they might have, and checked with the utilities and telephone companies, see United States v. Davis, supra, 557 F.2d at 1247, they apparently would have reached the same, single-occupancy, conclusion.

Finally, police inquiry and observation prior to the search indicated that only three persons lived at the house permanently at the time of the raid in question. Two of those people, the owner Minnie Wright and Patricia Wright, were related, while the third person, Shirley Boyd, at some times in the past had shared a bedroom with Patricia Wright.[10] That inquiry, moreover, had no reasonable way of uncovering the facts alleged by appellants that at least some of the tenants occasionally had rather casual rental arrangements with the owner, and that they did not have the run, for example, of Minnie Wright's kitchen on the first floor, but were supposed to use a kitchen in the basement.

Accordingly, we affirm the trial court's disposition of the search warrant issue on the ground that appellants had no recognizable expectations of privacy as to units smaller than the entire dwelling. Because we reach this conclusion, we need not rely on the trial court's further holding that, in any case, the police had probable cause to search any private subdivisions of the house that did indeed exist.

### III

During the police raid on the "T" Street dwelling, appellant Dorsey admitted occupancy of the room in which the officers seized all of the heroin introduced at trial, and he acknowledged ownership of a jacket found hanging in that room that contained paraphernalia associated with heroin use. These statements were introduced at trial, and Dorsey made no pretrial motion to suppress them, nor did he object to their introduction at trial. His own testimony at trial was to the effect that, although the statements were made, they were always coupled with his insistence that the substantial amount of heroin in the room was not his, having been brought there without his

9. Appellant Crawford did testify that, at the time she was living at the house, which was several months before the execution of the search warrant challenged here, one bedroom did have a lock. This testimony was disputed by the police, and no testimony showed that any bedroom door had locks at the time of the search.

10. Dorsey's testimony indicated that, at the time of the search, in addition to the people just mentioned who were known to the police, he lived there, as did Greg Boyd, Shirley's son, and perhaps another unnamed person who may have occupied the third floor.

The police did know from their prior arrests at the house that as many as seven people might be visiting or living there at one time. They, in fact, believed that the house served as a frequent stopping point for people associated with narcotics use. Nonetheless, the fact that many unrelated people pass through, or even live at, the same house does not by itself prove that each has privacy expectations vis-a-vis the others—or, if they do, that the police should know about them. Moreover, in this case, the government presented enough evidence to rebut even the inferences of multiple occupancy that might be drawn from the traffic of unrelated persons that passed through the "T" Street dwelling.

knowledge or consent by either Crawford or Wright, or both, to be prepared for distribution.

Dorsey now argues on appeal that the trial court should not have permitted the jury to hear the statements in the absence of a stronger showing by the prosecution that they were preceded by a knowing and intelligent waiver of his right to silence. *See Miranda v. Arizona, supra,* 384 U.S. at 444, 86 S.Ct. 1604. He further argues, as he must to overcome Fed.R.Crim.P. 52(b), that the government's failure to make this showing rises to the level of plain error, and hence requires notice and curative action by the court despite his failure to raise the issue in the trial court.[11]

▮ The circuit courts generally have held that an explicit waiver of the *Miranda* warnings in so many words is not a necessary prerequisite to the admission of statements made by an accused while in police custody. *See* cases cited in *Brewer v. Williams, supra,* 430 U.S. 387, 435 n.5, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) (White, J., dissenting). In some cases, "the particular facts and circumstances surrounding" a police officer's recitation of the *Miranda* rights and the defendant's subsequent statements, "including the background, experience, and conduct of the accused," assure that the defendant, before speaking, comprehended his rights and considered the gravity of relinquishing them. *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1022, 82 L.Ed. 1461 (1938); *see, e. g., Mitchell v. United States,* 140 U.S.App.D.C. 209, 434 F.2d 483 *cert. denied,* 400 U.S. 867, 91 S.Ct. 109, 27 L.Ed.2d 106 (1970); *Pettyjohn v. United States,* 136 U.S.App.D.C. 69, 72 & n.7, 419 F.2d 651, 654 & n.7 (1969), *cert. denied,* 397 U.S. 1058, 90 S.Ct. 1383, 25 L.Ed.2d 676 (1970). Moreover, a valid waiver may occur even though the accused had "less information" about the charges against him and the nature of his rights "than a qualified attorney might have insisted upon before offering a legal opinion

. . . ." *United States v. Anderson,* 175 U.S.App.D.C. 75, 77 n.3, 533 F.2d 1210, 1212 n.3 (1976).

Viewing the transcript in this case in light of these principles, we are confronted by evidence from which conflicting inferences might conceivably be drawn. On the one hand, police testimony makes clear that at least during the early stages of the raid on the "T" Street dwelling, noise, motion, and confusion reigned. *Compare United States v. James,* 528 F.2d 999, 1019–20 (5th Cir.), *cert. denied,* 429 U.S. 959, 97 S.Ct. 382, 50 L.Ed.2d 326 (1976); *United States v. Frazier,* 476 F.2d at 893, 896. People outside were "yelling," others were seen jumping out of upstairs windows, and the police had broken open the front door, rushed to the upper floors, called and given chase to people who did not stand still, and shouted at each other as contraband was discovered. Moreover, much of the activity centered around the room where appellant remained throughout the raid. Officers had moved into the room, told its occupants to freeze, and quickly seized several items. Other people were brought into the room until eventually it contained five suspects and at least five officers, one of whom simultaneously read to all of the suspects their rights.

On the other hand, the record could be read to suggest that by the time the five suspects were gathered in the middle bedroom, the bedlam had subsided. Furthermore, the record is consistent with the fact that appellant did give rational answers to police questions not directed expressly to him after hearing his rights read once—a relevant if not dispositive fact, *see Mitchell v. United States, supra,* 140 U.S.App.D.C. at 213–214, 434 F.2d at 487–88—and he also had a high school education as well as a period of service in the Navy, *see United States v. Marchildon,* 519 F.2d 337, 344 (8th Cir. 1975). Also, appellant himself testified to the fact of the reading of the rights, and in no way intimated that he did not grasp

11. Rule 52(b) is as follows:
   Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

their significance. These circumstances clearly suggest a potential for valid waiver.

█ The government holds the burden of proof on the waiver issue, and we indulge no presumptions in the government's favor in that endeavor. But the fact remains that appellant never raised his no-waiver claim below, and the prosecution was afforded no opportunity to sustain that burden. On the record with which appellant was fully content to go to the jury on the issue of guilt or innocence, arguing that his statements pointed towards the latter, he cannot be said on appeal to have established that the error now claimed was "plain" under the dictates of Fed.R.Crim.P. 52(b), *i.e.,* that it was "obvious, affect[ed] the substantial rights of the accused and if uncorrected would be an affront to the integrity and reputation of judicial proceedings." *United States v. McCord,* 166 U.S.App.D.C. 1, 8 n.10, 509 F.2d 334, 341 n.10 (1974) *(en banc), cert. denied,* 421 U.S. 930, 95 S.Ct. 1656, 44 L.Ed.2d 87 (1975). Viewing the trial record before us by that standard, we see no "plain error" necessitating our disturbance of the conviction.[12]

### IV

We turn to appellant Crawford's contention that, while testifying in her own defense, her credibility was improperly impeached by reference to a prior conviction. At the close of the pretrial proceedings, counsel for Crawford inquired of the court as to his client's vulnerability in this regard:

> MR. PEEK [for appellant Crawford]: [My question] has to do with prior petty larceny convictions of my client as to whether or not they can be used.
>
> My understanding is that it is the Court's discretion. I would think that it would be prejudicial to her, and I certainly do prefer that they not be used since she is going to testify.

MR. FOX [for the Government]: [T]here are several petty larcenies with respect to both women [defendants].

> \* \* \* \* \* \*

My request would be to use the petty larcenies because it seems to me they relate to credibility and honesty.

> \* \* \* \* \* \*

THE COURT: What were the outcomes with the petty larcenies? How long ago were they? What conditions were imposed and what were the sentences?

MR. FOX: One [of Crawford's convictions] was recently a shoplifting in Maryland. And the other two—they are all within the last ten years. I have the information at my desk.

THE COURT: I would suggest that you use the most recent one.

MR. FOX: All right.

> \* \* \* \* \* \*

MR. FOX: And just for the record . . . Fay[e] Crawford's most recent shoplifting [on which] she is now serving time [ ] in Maryland is 1977.

Tr. 91–92.

At the trial when Crawford was under cross-examination by the prosecution, the following occurred:

> Q. Are you the same Faye Powell Crawford who was convicted of shoplifting in Maryland this year?
>
> A. I am.

Tr. 385–86.

What we find most extraordinary about the foregoing is that none of the participants—court, prosecutor, or defense counsel—exhibits any visible awareness of the fact that impeachment by prior conviction is governed by Rule 609 of the Federal Rules of Evidence. That Rule, in paragraph (a) thereof, provides that impeachment shall be permitted

---

12. No court to our knowledge has ever held that insufficient proof of waiver of the *Miranda* rights is "plain error" *per se,* and several have suggested to the contrary. *See, e. g., United States v. Van Orden,* 469 F.2d 461, 464 (3d Cir. 1972), *cert. denied,* 410 U.S. 957, 93 S.Ct. 1430, 35 L.Ed.2d 691 (1973); *United States v. Rizzo,* 418 F.2d 71, 78 (7th Cir. 1969), *cert. denied,* 397 U.S. 967, 90 S.Ct. 1006, 25 L.Ed.2d 260 (1970); *United States v. Armetta,* 378 F.2d 658 (2d Cir. 1967).

only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant, or (2) involved dishonesty or false statement, regardless of the punishment.

■ In *United States v. Smith*, 179 U.S. App.D.C. 162, 551 F.2d 348 (1976), decided six months before the trial in the case before us, this court was at some pains to call to the attention of bench and bar the new era in the law of impeachment by prior conviction ushered in by the Federal Rules of Evidence, which took effect July 1, 1975. We pointed out that, in the case of prior crime convictions involving "dishonesty or false statement," Rule 609(a)(2), irrespective of the punishment provided, mandates admissibility for impeachment purposes; and there is no discretion in the court to rule otherwise. We also emphasized that for all other prior convictions punishable by death or imprisonment in excess of one year, Rule 609(a)(1) makes admissibility contingent upon a determination by the court that probative value outweighs prejudicial impact upon the defendant.

It is, we repeat, difficult to detect in the trial court record any consciousness of these governing considerations. The prosecutor seems to suggest that the petty larcenies could be used because they relate, as he put it, "to credibility and honesty." "Honesty," of course, might in this context be thought to be a simple use of the converse of the "dishonesty" included in Rule 609(a)(2), but "credibility" bears no relation to that part of the Rule; it would be relevant only to Rule 609(a)(1), which requires a judicial balancing of probativeness against prejudicial

effect as a prior condition of admissibility. And the common assumption that seems to run throughout the colloquy, namely, that petty larcenies, including shoplifting, are automatically admissible is not warranted in the light of *Smith*, where we analyzed at length the concept of *crimen falsi* consciously embodied by Congress in 609(a)(2), and, while holding only that attempted robbery does not qualify thereunder, warned that larceny would not either, except possibly on a showing of special circumstances going beyond stealth to fraud and deceit. *Id.* at 178 n.28, 551 F.2d at 364 n.28.

Although the trial judge in the transcript before us at one point asked some questions about the circumstances of the petty larcenies referred to by the prosecutor, he did not pursue the matter when the prosecutor accepted his suggestion that he "use the most recent one."[13] We know no more about that one than the prosecutor's characterization of it in his cross-examination of appellant, *i. e.,* "shoplifting in Maryland this year?" Our examination of the Maryland statutes reveals that there is a shoplifting statute, Md.Ann.Code, art. 27, § 551A (1976 & Cum.Supp.1977), which characterizes shoplifting (1) to a value of $100 or more as a felony punishable by a fine of not more than $1,000 or imprisonment in the penitentiary for not more than three years, and (2) to a value of under $100 as a misdemeanor punishable by a fine of not more than $500 or imprisonment for not more than 18 months, or by both a fine and imprisonment. Conviction under either would, because of the sanction for each of imprisonment in excess of one year, appear to qualify for impeachment purposes under Rule 609(a)(1), but the judge not only made no determination of the kind required by that provision as a *sine qua non* of admissibility

---

**13.** The trial court appeared to think that, so long as the prior conviction used for impeachment was "recent," there were no other problems as to its admissibility. This conceivably could have some reference to paragraph (b) of Rule 609, which prohibits use of prior convictions more than 10 years old. But even such a conviction may be used if "the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect." In any event, this paragraph (b) was not applicable because the conviction actually used in this case occurred earlier in the year in which this case was tried.

to impeach, but indicated no awareness that any such determination was necessary.[14]

On appeal the government argues primarily that Rule 609(a)(2) authorized admission of the prior conviction because shoplifting "involve[s] dishonesty or false statement." But, six months before the trial below, this court decided *United States v. Smith, supra,* which held that a prior attempted robbery conviction did not necessarily qualify for admission under Rule 609(a)(2), and which referred approvingly to two cases in the Third Circuit that refused to apply that rule automatically to prior convictions for petty larceny. *Id.,* 179 U.S. App.D.C. at 178, 551 F.2d at 364, *citing Government of Virgin Islands v. Toto,* 529 F.2d 278, 282 (3d Cir. 1976); *Government of Virgin Islands v. Testamark,* 528 F.2d 742, 743 (3d Cir. 1976). The Ninth Circuit has since—correctly, we think—adopted the approach of *Toto* in holding that a shoplifting conviction was not a crime involving "dishonesty or false statement" within the meaning of Rule 609(a)(2). *United States v. Ortega,* 561 F.2d 803 (9th Cir. 1977).

More generally, *Smith* held that Rule 609(a)(2) applicability occurs only if the pri-

or offense is "characterized by an element of deceit or deliberate interference with [the] ascertainment of truth." *United States v. Smith, supra,* 179 U.S.App.D.C. at 177, 551 F.2d at 363.[15] Our decision, however, following *Toto,* did contemplate that Rule 609(a)(2) may be operative if the prosecution can show that, although the prior crime was not characterized by an element of fraud or deceit, it nonetheless was committed by such means. *Id.* at 178 n.28, 551 F.2d at 364 n.28, *citing Government of Virgin Islands v. Toto, supra,* 529 F.2d at 281 n.3. *See United States v. Papia,* 560 F.2d 827, 847–48 (7th Cir. 1977).

The government argues that any commission of the crime of shoplifting involves the requisite deceit. A quick glance at the Maryland Code, however, refutes this argument. Its definition of shoplifting, Md.Ann.Code, art. 27, § 551A(a) (1976 & Cum.Supp.1977) has five parts.[16] The offense as first defined requires only that goods be removed from a mercantile establishment "with the intent to appropriate the same to the use of the person so taking," *id.* § 551A(a)(1). At worst, this type of shop-

---

**14.** The preferred, if indeed not the required, course is undoubtedly for the trial court to make "an explicit finding in terms of the Rule" and to give "some indication of the reasons for the finding . . . ." *United States v. Smith,* 179 U.S.App.D.C. 162, 171 n.17, 551 F.2d 348, 357 n.17 (1976); *accord, United States v. Cavender,* 578 F.2d 528 (4th Cir. 1978); *United States v. Mahone,* 537 F.2d 922, 929 (7th Cir.), *cert. denied,* 429 U.S. 1025, 97 S.Ct. 646, 50 L.Ed.2d 627 (1976).

**15.** As we emphasized in *Smith,* the courts are not lacking in an authoritative and explicit indication by Congress of its conception of "dishonesty and false statement." The bills enacting the Federal Rules of Evidence respectively passed by the House and the Senate had differing provisions on impeachment by prior conviction. Rule 609 as it finally emerged was the product of compromise in the Conference Committee. In its report that Committee had this to say of Rule 609(a)(2):

By the phrase "dishonesty and false statement" the Conference means crimes such as perjury or subornation of perjury, false statement, criminal fraud, embezzlement, or false pretense, or any other offense in the nature of crimen falsi, the commission of which involves some element of deceit, untruthful-

ness, or falsification bearing on the accused's propensity to testify truthfully.

**16.** Section 551A. Shoplifting.

(a) *What constitutes.*—In any mercantile establishment, it is unlawful for any person

(1) To remove any goods, wares or merchandise from the immediate place of display or from any other place within the establishment with the intent to appropriate the same to the use of the person so taking, or to deprive the owner of the use, or value, or any part thereof; or

(2) To obtain or attempt to obtain possession of any goods, wares or merchandise, by charging the same to a real person without the authority of such person, or to a fictitious person, with a like intent; or,

(3) To conceal any such goods, wares or merchandise with a like intent; or,

(4) To alter, remove, or otherwise disfigure any label or price tag with a like intent; or,

(5) To transfer any goods, wares or merchandise from a container in which the same shall be displayed or packaged to any other container with a like intent; and any person committing any of the acts mentioned is guilty of shoplifting.

lifting offense, like many petty larceny crimes, involves stealth, which *Smith* makes clear is not the same as deceit. *United States v. Smith, supra,* 179 U.S.App.D.C. at 178 n.28, 551 F.2d at 364 n.28. Hence, without knowing if, and under which subsection, Crawford was convicted of shoplifting under section 551A(a), or at least the circumstances of her offense, we are unable to uphold admissibility under 609(a)(2).

■■■ The government's position is thereby reduced to its claim that the erroneous introduction of the prior conviction was harmless, Fed.R.Crim.P. 52(a), that is to say, that the error, beyond a reasonable doubt, did not contribute to the verdict, *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (for cases involving a departure from constitutional norms), or at least that the error had no more than a "very slight" effect on the jury, *Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946) (for cases not involving "departure from a constitutional norm or a *specific command of Congress"*) (emphasis added). Once again leaving open the question of whether the *Chapman, Kotteakos,* or some intermediate standard applies, *see United States v. Smith, supra,* 179 U.S.App.

D.C. at 180, 551 F.2d at 366, we find that as to the heroin-related convictions Crawford's credibility was crucial, so that her impeachment by prior conviction may have had a significant impact and cannot qualify as harmless under either rule.[17] The heroin charges will have to be retried, therefore, if the trial court, after the proper inquiry, finds that the prior conviction was inadmissible under Rule 609(a).

■■■ Moreover, because, as the jury was instructed, the offense of unlawfully carrying a pistol during the commission of a felony included the element of conviction for possession of heroin with intent to distribute, we remand this conviction as well, with instructions that it be vacated in the event that a new trial is ordered and the narcotics distribution charge is either dismissed or the defendant is acquitted.[18] We have no occasion, however, to remand on Crawford's convictions for knowing receipt of a firearm in interstate commerce with the serial number removed, or for carrying an unlicensed firearm. Uncontradicted and convincing evidence, including Crawford's own testimony, established that she received and possessed the pistol, which had moved in interstate commerce, and that she had no license therefor.[19] There can be no

---

**17.** To convict appellant on both heroin offenses, the jury first had to disbelieve her testimony that she had no connection with the heroin. It then had to rely on several facts that she disputed, since the only uncontradicted fact on which the government relied to connect her with the heroin was her presence in the room where the narcotics were found. Moreover, those controverted facts that the government relied on—(a) that Crawford had $249 in cash on her person during the raid, (b) that she told a police officer she could "beat this case because I am an addict" and (c) that the officer heard her tell someone over the phone that "[t]hey got me with your stuff,"—were ambiguous at best with respect to intention to distribute.

**18.** The judge's instruction on this point was as follows:

The next count involves the unlawful carrying of a firearm during the commission of a felony.

The essential elements of this offense, each of which the Government must prove beyond a reasonable doubt, are, first, that the defendant committed the offense of possession of

heroin with intent to distribute. As previously defined to you, that would be count one of the indictment.

Second, that at the time that the defendant committed that offense, she unlawfully carried a firearm.

In order to find the defendant guilty of this offense, you must first find her guilty beyond a reasonable doubt of count one of the indictment, possession of heroin with intent to distribute.

If your verdict with respect to this defendant on count one is not guilty, then you must also find her not guilty of this offense.

If, on the other hand, you find this defendant guilty of count one, then you may find her guilty of this offense if you also find beyond a reasonable doubt that she unlawfully carried a firearm, that is, a pistol, at the time she committed the offense of possession of heroin with intent to distribute.

**19.** Among the firearms offenses for which Crawford was convicted, and which we do not remand with respect to the evidentiary error just discussed, is 18 U.S.C. § 922(k) (1976). This provision makes it "unlawful . . .

doubt, therefore, that the jury convicted her on the basis of evidence properly before it.

## V

Appellant Crawford also raises two objections related to the propriety of multiple convictions and sentences. In the first of these objections, involving multiple convictions and concurrent sentences for possession of heroin, 33 D.C.Code § 402 (1973), and for possession of the same drug with intent to distribute, 21 U.S.C. § 841(a) (1976), she is joined by appellant Dorsey. The government, by reason of *United States v. Moore*, 175 U.S.App.D.C. 103, 533 F.2d 1238 (1976), has conceded that dual conviction for these two offenses, even if followed by concurrent sentences, constitutes error, but it has raised a question about the proper means of correcting the problem. We have recently dealt with this question in *United States v. Knight*, 166 U.S.App.D.C. 21, 30, 509 F.2d 354, 363 (1974), and it remains for us now only to remand both appellants' cases with instructions to the District Court to vacate in each case one of the two heroin-related convictions as its discretion dictates.[20]

Crawford individually raises a somewhat similar objection to her multiple convictions and concurrent sentences for receipt of a pistol in interstate commerce with serial number removed, 18 U.S.C. § 922(k) (1976), unlawfully carrying a firearm during the commission of a felony, 18 U.S.C. § 924(c)(2) (1976), and carrying a firearm without a license, 22 D.C.Code § 3204 (1973).[21] On the one hand, we are persuaded that, on the facts presented here, Congress did not authorize dual convictions and separate sentences under section 924(c)(2) and section 3204. On the other hand, we find no stricture—statutory or constitutional—that prevents separate sentences from being imposed for violations of section 922(k) and either section 924(c)(2) or section 3204. Consequently, we remand on the firearms convictions under section 924(c)(2) and section 3204, with instructions to the District Court to vacate, in its discretion, one or the other.

### A.

According to the recent Supreme Court decision in *Simpson v. United States*, 435 U.S. 6, 12, 98 S.Ct. 909, 913, 55 L.Ed.2d 70 (1978), the first question that arises in a case where the defendant objects to multiple punishments imposed at a single criminal trial is "whether Congress intended to subject the defendant to multiple penalties for the single criminal transaction in which he engaged." Following this mandate, we now examine the statutory question whether, on the facts presented here, Congress intended a defendant to receive multiple punishments under 18 U.S.C. § 924(c)(2) and 22 D.C.Code § 3204.

Section 924(c)(2) provides that:

Whoever . . . carries a firearm *unlawfully* during the commission of any

---

knowingly to . . . receive, in interstate . . . commerce, any firearm which has had the . . . serial number removed" (emphasis added). A comparison of the careful phrasing in this section with that in its sister sections, *see Scarborough v. United States*, 431 U.S. 563, 569–70, 97 S.Ct. 1963, 52 L.Ed.2d 582 (1977), indicates that Congress did not require that persons convicted under § 922(k) have known that the serial number was removed, but only that they have received the firearm knowingly. The jury, without objection, was so charged in this case. *Cf. United States v. Ruisi*, 460 F.2d 153, 156 (2d Cir.) (normal presumption in favor of scienter is abandoned "when the purpose of the statute is to regulate objects . . . which in and of themselves are dangerous"), *cert. denied*, 409 U.S. 914, 93

S.Ct. 234, 34 L.Ed.2d 176 (1972). This point is important in the present context because, while Crawford admitted receipt of the gun, she disclaimed any awareness of the defaced serial number.

**20.** As indicated above at note 18, if, as to Crawford, the trial court vacates the federal possession/distribution offense, then it must also vacate the conviction under 18 U.S.C. § 924(c)(2).

**21.** Although there is some confusion regarding what sentence Crawford received for two of the firearms convictions, *see* note 5 *supra*, it is clear that the trial judge imposed concurrent sentences on all counts.

felony for which he may be prosecuted in a court of the United States, shall, in addition to the punishment provided for the commission of such felony, be sentenced to a term of imprisonment for not less than one year nor more than ten years (emphasis added).

After several years of careful study of the language and history of this 1968 provision by various circuit courts, it is beyond question that a separate element of this offense is the commission of some firearms offense at the same time as, and in addition to, the carrying of the firearm during the commission of a felony. *E. g., United States v. Soria*, 519 F.2d 1060, 1063–64 (5th Cir. 1975); *United States v. Ramirez*, 482 F.2d 807, 813–15 (2d Cir.), *cert. denied*, 414 U.S. 1070, 94 S.Ct. 581, 38 L.Ed.2d 475 (1973). That firearms offense, however, may derive from state and local, as well as federal, firearms laws. *United States v. Rivero*, 532 F.2d 450, 458–59 (5th Cir. 1976); *United States v. Howard*, 504 F.2d 1281, 1285–87 (8th Cir. 1974). As the government points out in its brief, a wealth of federal and local firearms infractions might serve as the "unlawful[ ]" carrying element[ of section 924(c)(2).

In this case, however, only *one* such firearms offense served that role. In charging the jury on count four, involving section 924(c)(2), the trial judge correctly identified as among the "essential elements" of section 924(c)(2) that "at the time that [Crawford] committed [the felony] she unlawfully carried a firearm." Tr. 521–22. He continued:

> You are instructed that within the District of Columbia, it is unlawful for a person to carry a pistol if the person carrying [it] is not licensed to carry it by the Chief of Police and if the person intended to do the act which constitutes

carrying a pistol without a license. Tr. 522.

The trial judge discussed no other means by which the jury could find the "unlawful[ ]" carrying element of section 924(c)(2) established. As such, the law of the case became that unlicensed carrying contrary to the 22 D.C.Code § 3204[22] was an "essential element[ ]" of the federal offense.

Immediately after giving the above charge under section 924(c)(2), the trial judge addressed "[t]he next count," which directly involved 22 D.C.Code § 3204, and which he identified as "carrying a pistol without a license." In describing this offense, he essentially repeated the charge to the jury that he had given just previously in describing the "unlawful[ ]" carrying element of section 924(c)(2).[23] As such, he clearly invited the jury to convict Crawford for the very same act that he previously had made essential to her conviction for another crime.

Appellant asserts that, where a single act or transaction is involved, Congress did not intend to subject a defendant to convictions under both section 924(c)(2) and the firearms offense constituting the "unlawful[ ]" carrying element of section 924(c)(2). In this regard, we note that the instant case involves the District of Columbia where Congress, in enacting both the federal and local criminal codes, acts as a single sovereign. This court repeatedly has been required to determine whether Congress intended to subject a defendant to multiple punishments for a single act or transaction under similar provisions in the federal and District of Columbia criminal codes. *E. g., United States v. Knight, supra,* 166 U.S. App.D.C. at 25–30, 509 F.2d at 358–63; *United States v. Canty,* 152 U.S.App.D.C. 103, 116–118, 469 F.2d 114, 127–29 (D.C. Cir. 1972). In resolving such cases, we have

---

**22.** That section makes it unlawful to "carry . . . a pistol, without a license therefor issued as hereinafter provided . . . ."

**23.** The next count involves carrying a pistol without a license. The essential elements of this offense . . . each of which the Government must prove beyond a reasonable doubt, are, first, that the defendant carried

openly or concealed on or about her person a pistol; second, that she was not licensed to so carry a pistol by the Chief of Police of the District of Columbia; third, that she had the intent to do the act which constitutes carrying a pistol without a license.

Tr. 522–23.

followed the rule that "unless the intent of Congress is stated 'clearly and without ambiguity, doubt will be resolved against turning a single transaction into multiple offenses.'" *United States v. Knight, supra,* 166 U.S.App.D.C. at 28–29, 509 F.2d at 361–62, *quoting United States v. Canty, supra,* 152 U.S.App.D.C. at 115–116, 469 F.2d at 126–27.

Support for appellant's interpretation of section 924(c)(2) is found in the plain language of the statute [24] insofar as the definition of an offense under section 924(c)(2) requires proof of *both* an underlying felony and an underlying firearms offense, but the penalty for section 924(c)(2) is framed in terms of enhancing *only* the penalty for the underlying felony. This omission suggests that, although Congress did intend to punish a defendant under both section 924(c)(2) and the underlying felony, it did not intend to punish a defendant under both section 924(c)(2) and the underlying firearms offense. *See* 2A C. Sands, Sutherland's Statutes and Statutory Construction § 47.23 (4th ed. 1973).

Further support for appellant's interpretation is found in the legislative history of section 924(c)(2). Although the overall purpose of section 924(c) was "to persuade the man who is tempted to commit a Federal felony to leave his gun at home," 114 Cong. Rec. 22231 (1968) (remarks of Rep. Poff, the floor sponsor of section 924(c)(2)), the word "unlawfully" was added to assuage the concerns of some Congressmen that a provision such as section 924(c)(2) might be used to prosecute a policeman or other person licensed to carry a firearm who, while carrying a firearm but not using it, committed a felony. *See United States v. Ramirez,* 482 F.2d 807, 813–14 (2d Cir. 1973) (tracing the legislative history of section 924(c)(2)). It

would be anomalous indeed to infer a congressional intent to punish a defendant twice for the underlying firearms offense, in light of the fact that the word "unlawfully" was added to narrow the scope of the statute, rather than to increase its deterrent effect.

In the instant case, where the "unlawful[ ]" carrying element of section 924(c)(2) involves an offense under the District of Columbia criminal code, we are persuaded that Congress did not authorize dual convictions and separate sentences under section 924(c)(2) *and* the underlying firearms offense, 22 D.C.Code § 3204. Accordingly, we remand Crawford's convictions under both section 924(c)(2) and section 3204 with instructions that the District Court, in its discretion, vacate one of the two convictions.

### B.

The next question is whether Crawford's dual convictions under section 922(k) [25] and either section 924(c)(2) or section 3204 are consistent with congressional intent. *See Simpson v. United States, supra,* 435 U.S. at 12, 98 S.Ct. 909. This analysis of legislative intent must start with the fact that Congress, especially over the past decade, has become increasingly aware of the danger that the use of firearms, especially in the commission of other crimes, poses to our society. Thus, in 1968 alone, the year that Robert Kennedy and Martin Luther King, Jr., fell victim to assassins' guns, Congress passed two sets of legislation aimed at the problem, both of which are relevant here.

The first firearms legislation passed in 1968 was Title IV of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. 90–351, 82 Stat. 225 ("Title IV"), which the Supreme Court has characterized

---

24. Whoever . . . carries a firearm *unlawfully* during the commission of *any felony* for which he may be prosecuted in a court of the United States, shall, *in addition to the punishment provided for the commission of such felony,* be sentenced to a term of imprisonment for not less than one year nor more than ten years.

18 U.S.C. § 924(c)(2) (1976) (emphasis added).

25. The statute provides:

It shall be unlawful for any person knowingly to transport, ship, or receive, in interstate or foreign commerce, any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered.

18 U.S.C. § 922(k) (1976).

as a "carefully constructed package of gun control legislation," *Scarborough v. United States*, 431 U.S. 563, 570, 97 S.Ct. 1963, 1967, 52 L.Ed.2d 582 (1977); *accord, Barrett v. United States*, 423 U.S. 212, 216–17, 96 S.Ct. 498, 46 L.Ed.2d 450 (1976). Title IV includes a long list of firearms-related offenses, 18 U.S.C. § 922(a)–(m) (1976), under one of which, section 922(k), appellant Crawford was convicted. The offenses listed in sections 922(a)–(m) address many facets of the firearms problem, including illicit commerce in firearms, *see, e. g., id.* § 922(a); sale to, and receipt by, particularly dangerous persons, *see, id.* § 922(d), (h); efforts to prevent tracing and identification, *see, e. g., id.* § 922(k); and sale of particularly dangerous weapons, *see, id.* § 922(b)(4).

The second major piece of firearms legislation passed in 1968 and relevant here was the Gun Control Act of 1968, Pub.L. 90–618, 82 Stat. 1213. Appellant Crawford was also charged and convicted under a provision emanating from this legislation, 18 U.S.C. § 924(c)(2). This provision deals with yet another aspect of the firearms problem, the unlawful carrying of a firearm during the commission of a felony.

Thus, two of the three provisions under which Crawford was convicted and sentenced are contained in recent enactments dealing with a variety of federal firearms offenses. Although the third offense, 22 D.C.Code § 3204, was passed much earlier, Act of July 8, 1932, ch. 465, § 4, 47 Stat. 651, and deals with local offenses, we may detect a general intent on the part of Congress to retain it, like other state and local provisions, as a constantly applicable backdrop of firearms regulation to which federal regulation, such as Title IV and the Gun Control Act, is added to the extent consistent with federalism concerns. *E. g.,* 114 Cong.Rec. 22231–32 (remarks of Rep. Poff); *id.* at 22232 (remarks of Rep. Eckhardt); *id.* at 22236 (remarks of Rep. Dowdy); *cf. Scarborough v. United States, supra,* 431 U.S. at 575 n.11, 97 S.Ct. 1963; *United States v. Bass,* 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971).

As a general matter, therefore, Congress seems intent upon approaching the firearms problem through a variety of federal regulatory means (*e. g.,* focusing on (a) illicit commerce, (b) ownership by particularly dangerous persons, (c) efforts to prevent tracing and identification, (d) particularly dangerous weapons, and (e) efforts to deter the use of firearms in the commission of a crime, etc., *see* 18 U.S.C. §§ 922, 924(c)(2)), which are themselves designed to augment state regulation (*e. g.,* licensing owners, *see* 22 D.C.Code § 3204). This supports an inference that in most cases congressional intent favors multiple firearms convictions.

Nonetheless, the courts have recognized in this and other areas that a general legislative intent to allow multiple convictions for charges arising out of the same class of criminal acts still may not indicate an intent to allow *all* possible multiple convictions arising out of that class. *E. g., Simpson v. United States, supra; United States v. Crew,* 538 F.2d 575 (4th Cir.) (holding that under at least two parts of the Gun Control Act of 1968—section 924(c)(2), unlawfully *carrying* a firearm during a felony, and section 924(c)(1), *using* a firearm during a felony—Congress did not intend multiple convictions), *cert. denied,* 429 U.S. 852, 97 S.Ct. 144, 50 L.Ed.2d 127 (1976); *see Heflin v. United States,* 358 U.S. 415, 79 S.Ct. 451, 3 L.Ed.2d 407 (1959) (Congress did not intend multiple convictions of one thief under 18 U.S.C. § 2113(c) and (d), for both taking property from a bank and possessing the same). Hence, we must look specifically at each of the three firearms offenses involved herein to test their compatibility with the general legislative willingness to utilize multiple and cumulative regulatory approaches to the misuse of firearms.

The only difficulty that we confront in this respect arises from the legislative history of section 924(c)(2). Although the plain language of the statute poses no bar to multiple convictions except to certain convictions under both section 924(c)(2) and the underlying firearms offense, *see* ——— ——— of 192 U.S.App.D.C., 938–939 of 591 F.2d, *supra,* Representative Poff, the sponsor of section 924(c)(2), stated on the floor of the House:

For the sake of legislative history, it should be noted that my substitute is not intended to apply to title 18, sections 111, 112, or 113 which already define the penalties for the use of a firearm in assaulting officials, with sections 2113 or 2114 concerning armed robberies of the mail or banks, with section 2231 concerning armed assaults upon process servers or with chapter 44 [*i. e.,* Title IV, including section 922] *which defines other firearms felonies.*

114 Cong.Rec. 22232 (1968) (emphasis added).

This language has recently been interpreted by the Supreme Court to prevent the Government from using a firearms-related provision other than section 924(c)(2) both to establish the "commission of [a] felony" element of section 924(c)(2) and to justify a separate conviction in its own right. *Simpson v. United States, supra; accord, United States v. Eagle,* 539 F.2d 1166, 1171–72 (8th Cir. 1976), *cert. denied,* 429 U.S. 1110, 97 S.Ct. 1146, 51 L.Ed.2d 563 (1977). Because, as charged to the jury in the present case, the felony underlying section 924(c)(2) was not firearms related [26] and the underlying firearms offense involved a provision other than section 922(k),[27] the question arises whether Representative Poff's statement was intended to effect a broader prohibition against combining a conviction under section 924(c)(2) with any other conviction for a firearms offense, even if that offense was not relied on as an element of section 924(c)(2).

We are convinced that Congress had no such intent to make conviction under section 924(c)(2) exclusive of conviction under any other firearms offense. As a whole, Representative Poff's discussion of section 924(c)(2) seems to permit—and even to encourage—its use in combination with other firearms offenses. He described the chief object of section 924(c)(2) as "persuad[ing] the man who is tempted to commit a Feder-

al [but, apparently, not a gun-related] felony to leave his gun at home." 114 Cong. Rec. 22231 (1968). The legislators appear to have hoped that those gun-toting felons who were not sufficiently chastened by the extant penalties for unlawful carrying *would* be deterred from taking their guns along when embarking on nonfirearms-related criminal activity by the additional threat of section 924(c)(2)'s stiff ten-year maximum penalty. *See United States v. Eagle, supra,* 539 F.2d at 1171–72. That deterrent policy, of course, is also served by the threat of multiple convictions for all firearms offenses committed by the felon.

Representative Poff's statement, quoted earlier, indicating that section 924(c)(2) was "not intended to apply" to certain firearms provisions, including one under which appellant was convicted, section 922(k), is consistent with this interpretation. That statement was made in the context of explaining why the drafters had not included state offenses among those *felonies* the commission of which is an element of section 924(c)(2). 114 Cong.Rec. 22231–32. As such, it seems relevant only to defining the "commission of [a] felony" element under section 924(c)(2). In this light, it seems clear that all Representative Poff meant by the language quoted earlier was that section 924(c)(2)'s deterrence-minded enhancement of the penalty for certain felonies if a firearm is involved "is not necessary . . . when the substantive [felony] itself" imposes a penalty for use of a firearm. *United States v. Eagle, supra,* 539 F.2d at 1172; *accord, United States v. Simpson, supra,* 435 U.S. at 13–14, 98 S.Ct. 909. When, however, an offense is committed that does not require use of a weapon as an element, but when a weapon was involved, Representative Poff indicated no resistance to invoking section 924(c)(2) as well as any other firearms offense available. Accordingly, we conclude that Crawford's dual convictions under section 922(k) and

26. The trial judge charged that conviction for the federal felony of possession of heroin with intent to distribute was a prerequisite to conviction under section 924(c)(2). Tr. 521.

27. The trial judge instructed the jury that 22 D.C.Code § 3204 was the underlying firearms offense. *See* —— of 192 U.S.App.D.C., 937 of 591 F.2d, *supra.*

either section 924(c)(2) or section 3204 are consistent with congressional intent.

### C.

In discussing the role of the double jeopardy clause[28] where multiple punishments are imposed at a single criminal trial, Justice Powell, in *Brown v. Ohio*, 432 U.S. 161, 165, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977), stated that "the role of the constitutional guarantee is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense." Thus, if *Brown v. Ohio* were our only guide, we would have terminated our constitutional inquiry upon concluding above that, on the facts presented here, Congress had authorized dual punishments under section 922(k) and either section 924(c)(2) or section 3204.

We are guided, however, not only by *Brown v. Ohio,* but also by the Supreme Court's subsequent decision in *Simpson v. United States, supra.* Justice Brennan's majority opinion in *Simpson* suggests that there is a constitutional inquiry under the double jeopardy clause apart from determining whether Congress intended to subject a defendant to multiple punishments for a single act or transaction. 435 U.S. at 11–13, 98 S.Ct. 909. That constitutional inquiry seems to turn on the test stated in *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932):

> The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not.

*See* 435 U.S. at 11–13, 98 S.Ct. 909. Thus, the implication of Justice Brennan's opinion is that, even if Congress intends to punish a defendant twice for violating two statutory provisions, the double jeopardy clause may bar such multiple punishment at a single trial if the two statutory provisions constitute the "same offense" under *Blockburger.*

Applying the *Blockburger* test to Crawford's convictions under section 922(k) and section 924(c)(2), we note that, under section 922(k), it is "unlawful for any person knowingly to . . . receive, in interstate . . . commerce, any firearm which has had the . . . manufacturer's serial number removed . . . ." If the jury had been instructed to consider section 922(k) as the firearms offense underlying the section 924(c)(2) count, then the section 924(c)(2) count would have included the section 922(k) count and constituted the "same offense" under *Blockburger.* But the jury was instructed to consider section 3204, not section 922(k), as the underlying firearms offense. There was, therefore, little or no chance that section 922(k) was linked in the jurors' minds to section 924(c)(2). As charged to the jury, "each provision require[d] proof of an additional fact"—removed serial number and an interstate nexus, in the case of section 922(k), unlicensed carrying during commission of a federal felony, in the case of section 924(c)(2)—"which the other [did] not." *Blockburger v. United States, supra,* 284 U.S. at 304, 52 S.Ct. 180 at 182. Therefore, as charged to the jury in the instant case, section 922(k) and section 924(c)(2) are not the "same offense" under *Blockburger.*

Similarly, because the local offense, 22 D.C.Code § 3204, involved unlicensed carrying, while section 922(k) required a removed serial number and an interstate nexus, it is clear, under *Blockburger,* that these two statutory provisions are not the "same offense."

▮ Thus, without reaching the question whether concurrent, as distinct from consecutive, sentences constitute, "multiple punishments" for double jeopardy purposes,[29] and putting aside our doubts about

---

**28.** The double jeopardy clause provides:

"[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb . . . ." U.S.Const., amend. V, cl. 2.

**29.** *See* Comment, *Twice in Jeopardy,* 75 Yale L.J. 262, 299 n.161 (1965). In discussing what constitutes "multiple punishments" for double jeopardy purposes, Justice Powell, in *Brown v. Ohio, supra,* 432 U.S. at 165, 97 S.Ct. 2221,

whether, in the context here of a single criminal trial, *Blockburger* has constitutional significance other than as a nonconstitutional tool of statutory construction for determining whether Congress intended to subject a defendant to multiple punishments for a single act or transaction,[30] we conclude that there is no double jeopardy bar to appellant's dual convictions because section 922(k) is not the "same offense" under *Blockburger* as either section 924(c)(2) or section 3204. We accordingly find no limitation—statutory or constitutional—barring Crawford's dual convictions under section 922(k) and either section 924(c)(2) or section 3204. However, on statutory grounds, we find it appropriate to remand Crawford's dual convictions under section 924(c)(2) and section 3204 so that one may be vacated.

To summarize, neither appellant raised a meritorious claim with respect to illegally seized evidence, but both must have their cases remanded to the District Court on other grounds. In the case of appellant Dorsey, the trial court must vacate one of his two heroin-related convictions. In the case of appellant Crawford, remand is made for the purpose of vacating one of her two heroin-related convictions, and one of her firearms convictions under 18 U.S.C. § 924(c)(2) and 22 D.C.Code § 3204. The trial court must also, as to her remaining heroin-related conviction, reconsider the admissibility of her prior shoplifting conviction under Rule 609(a); if it decides that the prior conviction was admissible, the conviction stands, subject to further review on appeal; if it decides that it should have been excluded, the conviction is reversed and a new trial ordered. In addition, the trial judge must on remand resentence appellant Crawford under 18 U.S.C. § 922(k) and amend the Judgment and Conviction Order accordingly. *See* note 5 *supra*.[31]

*It is so ordered.*

expressly limited his remarks to the situation where a defendant receives *consecutive* sentences at a single criminal trial for the same offense. On the other hand, the Supreme Court, in *Benton v. Maryland*, 395 U.S. 784, 787–91, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), recognized that adverse collateral consequences may flow from concurrent sentences. In *United States v. Hooper*, 139 U.S.App.D.C. 171, 172 n.3, 432 F.2d 604, 605 n.3 (1970), this court observed:

The factual collateral consequences [of concurrent sentences] include the possibility, as to defendant, that officials or other persons considering defendant's record in the future, whether for purposes of parole, employment, impeachment as witness, etc., may misapprehend the two convictions as relating to separate criminal activities.

But we need not reach the question whether concurrent sentences imposed at a single criminal trial constitute "multiple punishments" for double jeopardy purposes, because Crawford was not convicted twice for the "same offense" within the meaning of the double jeopardy clause.

**30.** *See Simpson v. United States, supra*, 435 U.S. at 18–19, 98 S.Ct. 909 (Rehnquist, J., dissenting).

**31.** Depending upon the action taken by the District Court on remand, two other errors in appellant Crawford's case may have to be corrected. First, if the trial court chooses not to vacate the conviction under 22 D.C.Code § 3204, then it must resentence the defendant for that offense and amend the Judgment and Conviction Order accordingly. *See* note 5 *supra*. On the other hand, if it chooses not to vacate the 18 U.S.C. § 924(c)(2) conviction, it must hold that conviction in abeyance pending its resolution of Crawford's heroin convictions. If her conviction for possession of heroin with intent to distribute is vacated as an overlapping offense, *see* note 20 *supra*, or she is acquitted upon retrial, *see* text at note 18 *supra*, then the section 924(c)(2) conviction also must be vacated.