**UNITED STATES of America**

v.

**Steven Lamont FEARWELL, Appellant.**

No. 78–1242.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 20, 1978.

Decided Dec. 27, 1978.

As Amended Dec. 28, 1978.

Rehearing Denied April 23, 1979.

As Amended on Denial of Rehearing April 25, 1979.

---

Thomas Zeno,* with whom Michael E. Geltner and Larry J. Ritchie, Washington, D. C. (appointed by this court), were on the brief, for appellant.

William J. Birney, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., and John A. Terry, Michael W. Farrell, and Eric B. Marcy, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before WRIGHT, Chief Judge, BAZELON, Circuit Judge, and AUBREY E. ROBINSON, Jr.,** District Judge.

Opinion for the court filed by J. SKELLY WRIGHT, Chief Judge.

J. SKELLY WRIGHT, Chief Judge:

This appeal comes to us from the United States District Court for the District of Columbia, where appellant Steven Fearwell

---

\* Entered an appearance as student counsel pursuant to Rule 20 of the General Rules of this court.

\*\* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

was convicted under 18 U.S.C. § 371 (1976) [1] of conspiracy to violate the Food Stamp Act, 7 U.S.C. § 2023 (1976). [2] On February 14, 1978 appellant was sentenced to a prison term of from 20 months to five years to run concurrently with any other sentence he was then serving. Prior to trial the prosecution informed defense counsel that, if appellant chose to testify, it intended to impeach his credibility by introducing evidence of his prior conviction of attempted petit larceny, and the trial court ruled that it would permit the prosecution to proceed with the impeachment as planned. Accordingly, it is argued on appeal, Fearwell, who was to have been the only witness to appear in his own behalf, decided not to testify. Further, the trial court, after making this ruling but before being informed that appellant would not testify, refused to grant a continuance so that counsel could devise a new defense strategy involving other witnesses.

Fearwell appeals from both rulings of the District Court and asks that his conviction be set aside. We agree that, under Federal Rule of Evidence 609(a), impeachment with evidence of the prior conviction involved in this case should not be permitted. Hence the trial judge was incorrect in ruling that the prosecution would be able to proceed, as planned, with its impeachment of Fearwell if he chose to testify. But because we do not know what Fearwell's testimony would have been, we cannot yet determine whether this error requires setting aside the conviction. Hence we remand to the District Court to determine the nature of his testimony. Finally, in our view the trial court did not err by refusing to grant a continuance.

## I. BACKGROUND

Appellant's conviction of conspiracy to violate the Food Stamp Act was in connection with an illegal scheme to use Authorization to Purchase (ATP) cards of the federal Food Stamp Program for personal gain. [3]

1. If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

   If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor. 18 U.S.C. § 371 (1976).

2. (a) Notwithstanding any other provisions of this chapter, the Secretary may provide for the purchase, issuance or presentment for redemption of coupons to such person or persons, and at such times and in such manner, as he deems necessary or appropriate to protect the interests of the United States or to insure enforcement of the provisions of this chapter or the regulations issued pursuant to this chapter.

   (b) Whoever knowingly uses, transfers, acquires, alters, or possesses coupons or authorization to purchase cards in any manner not authorized by this chapter or the regulations issued pursuant to this chapter shall, if such coupons or authorization to purchase cards are of the value of $100 or more, be guilty of a felony and shall, upon conviction thereof, be fined not more than $10,000 or imprisoned for not more than five years or both, or, if such coupons or authorization to purchase cards are of a value of less than $100, shall be guilty of a misdemeanor and shall, upon conviction thereof, be fined not more than $5,000 or imprisoned for not more than one year, or both.

   (c) Whoever presents, or causes to be presented, coupons for payment or redemption of the value of $100 or more, knowing the same to have been received, transferred, or used in any manner in violation of the provisions of this chapter or the regulations issued pursuant to this chapter shall be guilty of a felony and shall, upon conviction thereof, be fined not more than $10,000 or imprisoned for not more than five years, or both, or, if such coupons are of a value of less than $100, shall be guilty of a misdemeanor and shall, upon conviction thereof, be fined not more than $5,000 or imprisoned for not more than one year, or both.

   (d) Coupons issued pursuant to this chapter shall be deemed to be obligations of the United States within the meaning of section 8 of title 18. 7 U.S.C. § 2023 (1976).

3. The facts recounted in this section are drawn from the testimony of prosecution witnesses, upon which the jury evidently relied in reaching its guilty verdict. See generally Transcript (Tr.) 53–117 (testimony of prosecution witnesses). Although appellant did not testify, it fairly can be assumed that he would have disputed

Under the Food Stamp Program the issuing agency—in the District of Columbia, the Department of Human Resources—sends ATP cards each month to all persons eligible for food stamps. These cards state that if the recipient pays a specified amount he or she will receive food stamps valued at a greater amount. For example, the card may say that a payment of $40 will result in receipt of food stamps valued at $100.

There are, of course, a certain number of intended recipients of these cards who have perhaps died or moved, and who are at any event no longer resident at the address to which a card was sent. Cards sent in such cases are returned to the Department of Human Resources. Appellant's brother, Joseph Fearwell, was employed by the Department of Human Resources from September 1974 to July 1975, and one of his assigned tasks was to transport the returned cards from one floor of the Department to another. After terminating employment with the Department in July 1975, Joseph Fearwell regularly visited the Department and began to remove a number of the returned ATP cards on many of his visits. Once having removed the cards, it was quite simple for Joseph Fearwell to translate the stolen cards into food stamps and quite a handsome profit.

After a time, according to the Government's case, Joseph Fearwell started to supply stolen ATP cards to his brother, appellant here, who likewise began redeeming the stolen cards for stamps and then selling the stamps for profit. Joseph and Steven Fearwell were not, however, content to operate alone; they apparently feared that their repeated trips to redeem the ATP cards might arouse suspicion. Consequently, they enlisted the help of Ms. Yvonne Mason, a teller at the Friendship House Federal Credit Union. The agreement struck among the brothers Fearwell and Ms. Mason specified a fixed sum—apparent-

ly five dollars—that she would receive from the brothers for each stolen ATP card she redeemed in her capacity as clerk at the Credit Union. She testified that for a period ranging from mid-1976 to early 1977 one of the brothers would present her with a packet of cards two or three times a week, which she was happy to redeem for stamps so long as she was paid the agreed upon amount. Indeed, the record indicates that 99 stolen ATP cards, worth over $10,000, were redeemed through Ms. Mason in the relevant period, and that the cards bore a certain similarity in signatures. A handwriting expert for the prosecution testified that the similarity on many of the cards was attributable to a single person's having supplied the various signatures, and that that person was Steven Fearwell.[4]

## II. IMPEACHMENT

Before introduction of evidence had commenced at Steven Fearwell's trial, and out of the range of the jury, defense counsel informed the trial judge that the prosecution intended, if Fearwell chose to testify, to impeach his testimony with evidence of a prior conviction of attempted petit larceny. Tr. 4. Defense counsel asked the judge to rule that the conviction could not be used to impeach because "[i]t is a minor offense and is his only prior conviction to my knowledge." Tr. 5. The prosecution, wishing to use the prior conviction "purely for impeachment," id., argued in response that the crime of attempted petit larceny "involve[s] dishonesty[ ] and, as such, * * * goes to the defendant's credibility." Id. Further, the prosecution reasoned, attempted petit larceny "is not a particularly inflammatory type of conviction," Tr. 6, so presumably nothing would be lost and much would be gained by using the conviction for impeachment purposes. Defense counsel retorted, but without elaboration, that

the factual account in text, at least as to the salient aspects of his involvement in the illicit scheme.

4. Both Yvonne Mason and Joseph Fearwell pleaded guilty in the summer of 1977 to charges that they participated in the conspir-

acy described in text. Ms. Mason was sentenced to three years' probation and was required to volunteer 200 hours in community service. Joseph Fearwell was sentenced to a term in prison.

Fearwell intended to be the only witness in his own behalf. Yet when the trial judge specifically asked defense counsel whether Fearwell would testify notwithstanding the prospect of being impeached, counsel's only response was that "I believe he intends to. He wants to." *Id.*

This discussion among the trial judge, the prosecutor, and defense counsel did not, in terms, include a direct reference to the legal rule that governed the perplexity confronting them, Federal Rule of Evidence 609(a), or to this circuit's leading case construing Rule 609(a), *United States v. Smith*, 179 U.S.App.D.C. 162, 551 F.2d 348 (1976).[5] The rule is straightforward enough:

> (a) *General rule.* For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudical effect to the defendant, or (2) involved dishonesty or false statement, regardless of the punishment.

To be admitted under Rule 609(a)(1), the prior conviction must have been "punishable by death or imprisonment in excess of one year." There is no indication in the record that Fearwell's prior conviction was anything other than the misdemeanor of attempted petit larceny, and counsel at oral argument suggested that the attempted petit larceny was committed in the District of Columbia. The language of the provision in the District of Columbia Code in which petit larceny is described stipulates that a person convicted under its authority faces punishment of imprisonment "for not more than one year." 22 D.C.Code § 2202 (1973). As a general category of crime, moreover, in no matter what jurisdiction, the misdemeanor of attempted petit larceny

would not likely be punishable in more severe terms. Indeed, a leading text on criminal law points out that petit larceny is normally classified as "a misdemeanor with a maximum punishment of six months [*sic*] imprisonment." W. LaFave & A. Scott, Criminal Law 634 (1972). Accordingly, it is clear that Rule 609(a)(1) does not apply, because that subsection of the rule requires, *inter alia*, that the crime underlying the prior conviction be "punishable by death or imprisonment in excess of one year."

We are left with Rule 609(a)(2). Under this prong the trial judge *must* permit use of the prior conviction for impeachment purposes if the crime underlying the conviction involved "dishonesty or false statement, regardless of the punishment.". This court, in *United States v. Smith, supra*, held that the crime of attempted robbery did not qualify for automatic admission pursuant to Rule 609(a)(2), because that crime involves no "dishonesty or false statement," as required by that subsection of the rule. "[D]ishonesty or false statement," the court concluded, was clearly intended by Congress "to denote a fairly narrow subset of criminal activity." 179 U.S.App.D.C. at 176, 551 F.2d at 362. In reaching this conclusion the court in *Smith* relied on the Conference Committee Report, which described "dishonesty or false statement" in terms of

> crimes such as perjury or subornation of perjury, false statement, criminal fraud, embezzlement, or false pretense, or any other offense in the nature of *crimen falsi*, the commission of which involves some element of deceit, untruthfulness, or falsification bearing on the accused's propensity to testify truthfully.

H.R.Conf.Rep.No.93–1597, 93d Cong., 2d Sess. 9, *reprinted in* [1974] U.S.Code Cong. & Ad.News, 7098, 7103. *See United States v. Smith, supra*, 179 U.S.App.D.C. at 176, 551 F.2d at 362.

The *Smith* case, to be sure, involved the crime of attempted robbery, not attempted

---

5. There were, however, references to *Luck v. United States*, 121 U.S.App.D.C. 151, 348 F.2d 763 (1965). *See, e. g.* Tr. 4 (reference to a potential "Luck problem"). In *United States v.*

*Smith*, 179 U.S.App.D.C. 162, 179, 551 F.2d 348, 365 (1976), this court stated that *Luck* and its progeny are now "essentially irrelevant" on the impeachment issue.

petit larceny. But since *Smith* was handed down this court has decided *United States v. Dorsey,* 192 U.S.App.D.C. ——, 591 F.2d 922 (D.C. Cir. No. 77–1750, decided December 21, 1978), in which it was held that the crime of shoplifting as defined in Article 27, Section 551A(a)(1) of the Maryland Code[6] did not involve the deceit requisite to meeting Rule 609(a)(2)'s rigid standard. As the court wrote in *Dorsey,* "At worst, this type of shoplifting offense, *like many petty larceny crimes,* involves stealth, which *Smith* makes clear is not the same as deceit." 192 U.S.App.D.C. at ——, 591 F.2d at 935 (emphasis added). The District of Columbia Code, relevant to the present case, defines petit larceny as "feloniously tak[ing] and carry[ing] away any property of value of less than $100 * * *." 22 D.C.Code § 2202 (1973).[7] Because there is no suggestion of fraud or deceit as an element, this offense would seem to fit *Dorsey's* distinction between crimes involving stealth and those involving deceit. Indeed, unless specified to the contrary in the controlling statute, it would seem that petit larceny does not involve the requisite deceit to qualify for admission under Rule 609(a)(2).[8]

To understand why attempted petit larceny is outside the scope of Rule 609(a)(2), we must turn, as this court did in *Dorsey,* to the *Smith* case, which penetratingly analyzed the nature of Rule 609(a)(2). In that case, as we have pointed out, the court held

that attempted robbery did not qualify as a crime involving "dishonesty or false statement." But *Smith* went further by rendering most succinctly the crimes that *could* be used to impeach under Rule 609(a)(2): "those crimes characterized by an element of deceit or deliberate interference with a court's ascertainment of truth." *United States v. Smith, supra,* 179 U.S.App.D.C. at 177, 551 F.2d at 363. This language penetrates to the core of Rule 609(a)(2) because it closely tracks the intent of Congress as evidenced by language in the Conference Committee Report that describes "dishonesty or false statement." The Report focuses on crimes "bearing on the accused's propensity to testify truthfully." H.R.Conf.Rep. No.93–1597, 93d Cong., 2d Sess. 9, *reprinted in* [1974] U.S.Code Cong. & Ad.News, pp. 7098, 7103.

■ Building on the solid foundation of *Smith,* and on application of *Smith's* analysis to the crime of shoplifting in *Dorsey,* we conclude today that the crime of petit larceny does not involve dishonesty or false statement. Thus it is covered by neither Rule 609(a)(1) nor Rule 609(a)(2). This crime, like multifarious others of a similar nature, simply has no bearing whatever on the "accused's propensity to testify truthfully." H.R.Conf.Rep. No. 93–1597, *supra,* at 9, [1974] U.S.Code Cong. & Ad.News at 7103. Accordingly, evidence of a prior conviction

6. 27 Md. [Crimes and Punishments] Code Ann. § 551A (1976):

§ 551A. Shoplifting.

(a) *What constitutes.*—In any mercantile establishment, it is unlawful for any person
(1) To remove any goods, wares or merchandise from the immediate place of display or from any other place within the establishment with the intent to appropriate the same to the use of the person so taking, or to deprive the owner of the use, or value, or any part thereof[.]

7. "Feloniously," as used in this definition, obviously means "being against the law," and does not mean having to do with a felony. *See* Webster's Third New International Dictionary (unabridged) 836 (1961).

The D.C.Code's definition of attempted petit larceny quoted in text tracks closely the definition of the crime of shoplifting contained in the Maryland Code, particularly that contained in 27 Md. [Crimes and Punishment] Code Ann.

§ 551A(a)(1), *quoted in* note 6 *supra.* Hence, though *Dorsey's* holding was quite properly limited to the particular prior conviction at issue there, it would seem, owing to the definitional overlap with the prior conviction involved in the present case, that the arguments adopted by Judge McGowan in that case have particular force when applied to the question before us now.

8. *Smith* and *Dorsey* leave open the possibility "that Rule 609(a)(2) may be operative if the prosecution can show that, although the prior crime was not characterized by an element of fraud or deceit, it nonetheless was committed by such means." *United States v. Dorsey,* 192 U.S.App.D.C. ——, 591 F.2d 935 (1978); *see United States v. Smith, supra* note 5, 179 U.S.App.D.C. at 174 n.28, 551 F.2d at 364 n.28.

for petit larceny may not be admitted for the purpose of attacking the credibility of a witness.

■ In reaching this conclusion, we do not stray from the collective wisdom of our sister circuits. Indeed, to this date the Second,[9] Third,[10] Fourth,[11] Fifth,[12] Seventh,[13] Ninth,[14] and Tenth [15] Circuits have in varying degrees come to the same conclusion that we reach here today. Thus the import of *Smith, Dorsey,* and the present case, in combination with the various decisions of the other circuits, can be described as follows: Rule 609(a)(2) is to be construed narrowly; it is not *carte blanche* for admission on an undifferentiated basis of all previous convictions for purposes of impeachment; rather, precisely because it involves no discretion on the part of the trial court, in the sense that all crimes meeting its stipulation of dishonesty or false statement must be permitted to be used for impeachment purposes, Rule 609(a)(2) must be confined, in the words of *Smith,* to a "narrow subset of crimes"—those that bear *directly* upon the accused's propensity to testify truthfully. Quite simply, attempted petit larceny is not within this subset.

### III. HARMLESS ERROR

■ The Government contends that, even if this court holds, as it in fact does, that the trial court erred by ruling that appellant's prior attempted petit larceny convic-

tion could be used for impeachment purposes, the error involved was harmless. Appellant counters by arguing that, because the trial court's ruling upset the defense strategy, the error was harmful and accordingly this court should upset appellant's conviction.

In *Smith* the trial court's ruling that a previous conviction of armed robbery could be used for impeachment purposes was held on appeal to be harmful error because, as is argued in the present case, the defendant chose not to testify in light of the possibility that the prior conviction would be used against him. In that case, however, the evidence of the defendant's involvement in the bank robbery in question was much more problematic than that of appellant's involvement in the conspiracy at issue here. In *Smith* photographs taken in the bank during the robbery "were somewhat hazy in texture, and may perhaps have left the jurors with some doubt that either of the robbers pictured actually was [the defendant]." *United States v. Smith, supra,* 179 U.S.App.D.C. at 179, 551 F.2d at 365. Moreover, despite the defendant's presence in a lineup, the bank manager identified two other individuals as robbers (including another defendant) but not the defendant in question. In short, "[h]ad a resolute denial from the witness stand by [the defendant] accompanied the indistinct character of the bank photos and the misidentifi-

9. *See United States v. Hayes,* 553 F.2d 824, 827 (2d Cir.), *cert. denied,* 434 U.S. 867, 98 S.Ct. 204, 54 L.Ed.2d 143 (1977) ("The use of the second prong of Rule 609(a) is thus restricted to convictions that bear *directly* on the likelihood that the defendant will *testify* truthfully (and not merely on whether he has a propensity to commit crimes).") (emphasis in original).

10. *See, e. g., Government of Virgin Islands v. Toto,* 529 F.2d 278, 281–282 (3d Cir. 1976) (Rule 609(a)(2) does not alter previous Third Circuit rule focusing "on the accused's propensity to testify truthfully").

11. *See United States v. Cavender,* 578 F.2d 528, 534 (4th Cir. 1978) (dictum).

12. *See United States v. Ashley,* 569 F.2d 975, 978 (5th Cir. 1978) (shoplifting conviction not admissible under Rule 609(a)(2)).

13. *See United States v. Papia,* 560 F.2d 827, 847–848 (7th Cir. 1977) (theft convictions "rest[ing] on facts revealing fraud and deceit" admissible under Rule 609(a)(2)).

14. *See United States v. Ortega,* 561 F.2d 803, 806 (9th Cir. 1977) (adopting Third Circuit's views in *Government of Virgin Islands v. Toto, supra* note 10: "[a]n absence of respect for the property of others is an undesirable character trait, but it is not an indicium of a propensity toward testimonial dishonesty.").

15. *See United States v. Seamster,* 568 F.2d 188, 190 (10th Cir. 1978) (Rule 609(a)(2) contemplates crimes "which would tend to show that an accused would be likely to testify untruthfully").

cation by [the bank manager], his stance before the jury would have been ponderably different." 179 U.S.App.D.C. at 180, 551 F.2d at 366.

Similarly, in *Dorsey* use of a prior shop-lifting conviction for impeachment purposes was held to be harmful error, and the conviction of the defendant for certain narcotics violations, in consequence, was set aside. In that case the only uncontradicted fact on which the Government could rely to connect the defendant to the confiscated heroin was the defendant's presence in the room in which the narcotics were found. All other facts relied on were not only controverted by the defendant, but were also "ambiguous at best with respect to intention to distribute." *United States v. Dorsey, supra* 192 U.S.App.D.C. at —— n. 17, 591 F.2d at 936 n.17.[16]

In the present case, however, leaving aside for the moment the significance of the fact that Fearwell did not testify, the Government's evidence against appellant certainly was not "ambiguous at best" with respect to the crime charged and appellant's participation in it. *United States v. Dorsey, supra,* 192 U.S.App.D.C. at —— n. 17, 591 F.2d at 936 n.17. A Special Agent of the United States Department of Agriculture, the national agency through which the Food Stamp Program is administered, testified in meticulous detail on the operation of the program. He went on to describe the

investigative process that led both to identifying the 99 ATP cards at issue in this case and to establishing Yvonne Mason's relationship to those cards.[17] Appellant's brother, Joseph Fearwell, after first denying that he had given his brother any stolen ATP cards, later admitted to having given him some on occasion, though not during the period from mid-1976 to early 1977.[18] The clerk at the Credit Union, Ms. Yvonne Mason, testified that appellant recruited her to the illicit scheme by offering to pay her five dollars per stolen card that she redeemed. She also testified that both brothers came to her in her capacity as clerk at the Credit Union to redeem ATP cards that were identified at trial as having been stolen.[19] Finally, the prosecution's expert witness on handwriting, duly qualified before the court, *see* Tr. 104, testified unequivocally that the signatures on the stolen ATP cards admitted into evidence, bearing Yvonne Mason's stamp from the Credit Union, "were all written by one[ ] Steven Fearwell." Tr. 106.[20]

*Kotteakos v. United States,* 328 U.S. 750, 764–765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), held that a trial court's error, with the exception of those errors causing a departure from a constitutional norm or from a specific command of Congress, is considered harmless even if it had a "very slight effect" on the jury's decision. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17

---

16. Moreover, those controverted facts that the government relied on—(a) that Crawford had $249 in cash on her person during the raid, * * * (b) that she told a police officer she could "beat this case because I am an addict" and (c) that the officer heard her tell someone over the phone that "[t]hey got me with your stuff," * * *—were ambiguous at best with respect to intention to distribute. *United States v. Dorsey, supra* note 8, 192 U.S.App.D.C. at —— n. 17, 591 F.2d at 936 n.17.

17. *See* Tr. 53–69 (testimony of Special Agent Michael D. Janney, United States Department of Agriculture).

18. *See* Tr. 71–87 (testimony of Joseph Fearwell). Joseph Fearwell left open the possibility that his brother Steven, during the period from mid-1976 to early 1977, acquired the stolen cards from him "indirectly":

Q. During this period of time from July of '76 to January of '77, did you give cards to your brother, Steven Fearwell?
A. Not directly.
Q. What do you mean "not directly"?
A. I didn't put them in his hand.
Q. What did you do?
A. I just left them at home.
Q. And he picked them up?
A. I don't know.
Tr. 82.

19. *See* Tr. 90–101 (testimony of Yvonne Mason).

20. *See* Tr. 101–117 (testimony of Robert J. Muehlberger, Document Analyst, United States Postal Inspectors Crime Laboratory, Washington, D.C.).

L.Ed.2d 705 (1967), filling in the exception to *Kotteakos,* held that an error in the trial court that caused departure from a constitutional norm—no mention is made of a congressional command—cannot be considered harmless by an appellate court unless the court is convinced "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." 386 U.S. at 24, 87 S.Ct. at 828. Here, of course, we are dealing with a specific command of Congress—Federal Rule of Evidence 609(a)(2). Since *Kotteakos* structured the exception to its "very slight effect" rule both in terms of such a congressional command and in terms of a constitutional norm, it might be that the more rigid test enunciated in *Chapman* should be applied in this case, notwithstanding *Chapman*'s exclusive emphasis on trial court errors that rise to constitutional dimension.

We need not decide this issue [21] now, however, because not knowing what Fearwell's testimony would have been leaves us unable to apply either test for harmless error. Thus we remand the record to the District Court for the limited purpose of taking the defendant's testimony (subject to the Government's cross-examination) so that the trial judge can in the first instance decide whether the error was harmless.[22]

**21.** This issue recurs repeatedly, and must eventually be decided. *See United States v. Dorsey, supra* note 8, 192 U.S.App.D.C. at ——, 591 F.2d at 935; *United States v. Smith, supra* note 5, 179 U.S.App.D.C. at 179–180, 551 F.2d at 365–366. We are reluctant to do so, however, where, as here, the issue has not properly been raised and developed in the District Court.

**22.** We note that defense counsel did not proffer to the District Court what his client's testimony would have been. Such a proffer, though by no means required to secure a ruling of harmful error from this court, would certainly go some distance in assisting appellate courts generally to solve what has been termed "the riddle of harmless error." *See generally* R. Traynor, The Riddle of Harmless Error (1970). An appellate court, in making its determination on the harmless error issue, could rely on such a proffer as if it were evidence introduced at trial.

## IV. REFUSAL TO GRANT A CONTINUANCE

When the trial court ruled that it would permit the prosecution to impeach appellant's testimony with evidence of his prior conviction if appellant chose to take the stand, it did so only after consulting with defense counsel as to the implications of such a ruling. "[Defendant] would testify if it is a minor offense and is brought out, wouldn't he?" the court inquired. Tr. 6. Defense counsel ultimately answered, "I believe he intends to. He wants to." *Id.* Yet after the Government concluded its case, counsel indicated to the trial court that his client would not testify, though he did not specify any reason for Fearwell's refusal to do so.

Early in the proceedings, upon apprising his client of the possibility of impeachment, defense counsel had been informed by appellant that he would like the opportunity to call other witnesses in his own behalf. This would have necessitated the trial court's granting a continuance so that those witnesses could be interviewed and subpoenaed. The trial judge denied counsel's motion for a continuance. Tr. 37–38. Appellant contests this ruling by arguing that the denial constituted an abuse of discretion by the trial court.[23]

**23.** Interestingly, the transcript indicates defense counsel's apparent uncertainty over whether the continuance should be granted:

When I [defense counsel] returned to counsel's table after [the judge's ruling on impeachment], he [defendant] advised me that since his testimony, if he is to testify, could be impeached, that he would like to call other witnesses.

I have advised that we did discuss this one week ago in an interview that I had in this courthouse cellblock, at which time that area was investigated as to whether he wished to have other witnesses subpoenaed; and after giving it consideration, he said no.

And I reminded him of that, and this is the day of trial; and it is too late for me to interview witnesses or subpoena them.

At the same time, Mr. Fearwell said he would like to have the case continued; and I advised him that I did not think the Court would permit this, that it had been on the Court's calendar for some time, and that there was no urgent reason that I could ad-

780

Trial courts are vested with broad discretion to deny motions of the sort at issue here. *Ungar v. Sarafite,* 376 U.S. 575, 588–591, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964). To be sure, a court may not do so wantonly and may not, in denying such a motion, preclude "a just determination of the cause." *Neufield v. United States,* 73 U.S. App.D.C. 174, 179, 118 F.2d 375, 380, *cert. denied,* 315 U.S. 798, 62 S.Ct. 580, 86 L.Ed. 1199 (1941). But in this case the defense had ample opportunity to prepare for contingencies that might have arisen at trial.

Seeking a continuance so that witnesses may be secured for testimony in court is indisputably an acceptable and, at times, a preferred course of action. But in the present case the record indicates that no showing was made of who the witnesses would have been, what their testimony would have been, whether that testimony would have been relevant to the issues extant in the case, or whether they would probably have been available for testifying if the continuance were granted. *See id.* We do not hold that the record must indicate that all of these items were proffered by counsel below. But where, as here, the possibility of calling additional witnesses had been discussed by the defense, there must be some showing that granting the continuance will somehow further the court's attempt to secure "a just determination of the cause." *Id. See United States v. Oliver,* 187 U.S.App.D.C. 230, 230–231, 571 F.2d 664, 664–665 (1978) *(per curiam).*

## V. CONCLUSION

For the reasons stated in this opinion, we hold that the trial court erred by ruling that it would permit the prosecution to impeach appellant's testimony with evidence of appellant's prior conviction for attempted petit larceny. But, in the context of this particular case, we are unable to determine "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California, supra,* 386 U.S. at 24, 87 S.Ct. at 828. We therefore remand the record to the District Court solely to take the defendant's testimony (subject to the Government's cross-examination) so that the trial judge can decide initially whether the error was harmless. Further, the trial court did not in our view abuse its discretion by refusing to grant a continuance.

So ordered.

vance in asking the Court to continue the matter.

I think that it should be put on the record. That is why I bring this up.

Tr. 37. The trial court, after this statement of counsel, denied the motion for a continuance, but did offer to issue subpoenas for witnesses immediately. Tr. 38. Apparently, the court's offer was not accepted.